IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

LUCIA HOGAN et al.,                )
                                   )
       Plaintiffs,                 )
                                   )
          v.                       )    1:08cv250 (JCC)
                                   )
FAIRFAX COUNTY SCHOOL BOARD,       )
                                   )
       Defendant.                  )

**M E M O R A N D U M   O P I N I O N**

This matter comes before the Court on cross-motions for summary judgment on the administrative record in a case brought under the Individuals with Disabilities Education Act ("IDEA"). The motions were filed by Defendant Fairfax County School Board ("Defendant") and Plaintiffs Lucia Hogan (the "Student"), Lucia Hogan by and through her father and attorney-in-fact, William Hogan, and William Hogan in his own capacity (the "Parent") (collectively, "Plaintiffs"). Also before the Court are two related motions regarding supplemental evidence offered by Plaintiffs: Plaintiffs' motion to allow certain additional evidence, some of which relates to the issue of attorney's fees, and Defendant's motion to strike a declaration by Plaintiffs' former counsel related to the attorneys' fee request. For the reasons stated below, the Court will grant in part and deny in part Plaintiffs' Motion for Summary Judgment and deny Defendant's

1

Motion for Summary Judgment.  Additionally, the Court will deny Defendant's motion to strike and grant Plaintiff's motion to allow additional evidence.

## I. Background

Plaintiffs filed a three-count complaint (the "Complaint") in this Court on March 14, 2008.  The Complaint challenges two rulings made by the hearing officer (the "Hearing Officer") in the state administrative due process hearing (the "Hearing") initiated by the Plaintiffs.  At the Hearing, Plaintiffs argued that Defendant should reimburse them for their private placement of the learning-disabled student and provide compensatory education.[1]  *See* 20 U.S.C. § 1415.  Count I challenges the Hearing Officer's partial reduction of the reimbursement amount (Compl. ¶¶ 29-39) and Count II challenges his denial of compensatory education (Compl. ¶¶ 40-51).  Count III asks Defendant to reimburse Plaintiffs' attorney's fees and costs related to the state administrative proceedings.  (Compl. ¶¶ 52-62.)

This case deals only with the 2005-2006 school year. During that year, Fairfax County Public Schools ("FCPS") did not provide any educational services to the Student.  The Parent

_____

[1] Compensatory education, which can be a form of "appropriate relief" under the IDEA, is defined as the "educational services ordered by the court to be provided prospectively to compensate for a past deficient program." *G. v. Fort Bragg Dependent Schools*, 343 F.3d 295, 308-09 (4th Cir. 2003) (citations and internal quotation omitted).

2

placed the Student in a private educational program for 12 weeks. At the Hearing, Plaintiffs sought both reimbursement for the expenses related to that private placement and, as an equitable remedy for FCPS's failure to provide the "free appropriate public education" ("FAPE") required by the IDEA, compensatory education. During the Hearing, held over four days in November 2007, the Hearing Officer agreed with Plaintiffs that the FCPS, operated by Defendant, failed to provide the Student with a FAPE during the 2005-2006 school year. (Admin. R., tab 465, at 2.)[2]

The Hearing Officer agreed with Plaintiffs that the education provider that they used for the Student in 2005 was an appropriate placement. (Hr'g Dec. 22-23.)  After finding that the Parent's "unjustified lack of real cooperation" was partly to blame for the FCPS's failure to offer a FAPE, the Hearing Officer decided that Plaintiffs deserved reimbursement for the private placement but reduced the reimbursement award by 1/3rd – from $28,079.52 to $18,719.68 – to reflect the "unreasonable actions" of the Parent. (Hr'g Dec. 2, 28).  The Hearing Officer also denied Plaintiffs' request for compensatory education. (Hr'g Dec. 30.)

---

[2] Henceforth, citations to the administrative record will note the tab number and then the page number, *e.g.*, "A.R. 17 at 2."  Citations to the Hearing Officer's decision, found at tab 465, will be denominated "Hr'g Dec."

Plaintiffs brought suit in this Court as parties aggrieved by a decision of an administrative hearing officer. *See* 20 U.S.C. § 1415(i)(2)(A).  This case differs from the typical IDEA action in that no party is challenging the Hearing Officer's decision as to whether FCPS provided the Student with a FAPE; instead, the dispute centers on the appropriate remedy for the FCPS's acknowledged failure to provide a FAPE during the 2005-2006 school year.  Defendant also does not challenge the Hearing Officer's finding that Plaintiffs deserve at least some reimbursement for the private placement.  Indeed, FCPS has already paid the Parent the $18,719.68 awarded by the Hearing Officer.

Plaintiffs and Defendant filed their respective motions for summary judgment on the administrative record on February 23, 2009.  In accordance with the deadlines set by two agreed orders, the parties submitted opposition briefs on March 11, 2009 and reply briefs on March 23, 2009.  Two other issues are before the Court.  On January 14, 2009, Plaintiffs moved the Court to allow them to submit additional evidence.  Defendant opposed the motion on January 20, 2009, and Plaintiffs filed a reply brief on January 28, 2009.  On March 27, 2009, Defendant moved to strike a declaration by Plaintiffs' former counsel in support of their attorney's fee request.  Plaintiffs opposed the motion to strike on March 30, 2009.

4

The Court heard oral arguments on the cross-motions on March 31, 2009 and took the matter under advisement.  On June 23, 2009, the Court asked the parties to submit additional briefing on the Supreme Court's recent IDEA decision, *Forest Grove School District v. T.A.*, No. 08-305 (U.S. June 22, 2009).  The parties submitted their memoranda on July 2, 2009; on July 14, Plaintiffs asked to file a reply memorandum to respond to arguments raised in Defendant's brief.  The Court granted that request on July 17, 2009.  The parties' motions are before the Court.

## II. Standard of Review

A district court reviewing a state administrative decision under the IDEA may grant summary judgment based upon the administrative record.  *See, e.g.*, *DeLullo v. Jefferson Co. Bd. of Educ.*, 71 F. Supp. 2d 554 (N.D. W. Va.1998), *aff'd*, 194 F.3d 1304 (4th Cir. 1999).  "Actions authorized under [20 U.S.C. § 1415(i)(2)] are procedurally unique in that they are independent civil actions in which the district court considers the record of the state administrative hearing, as well as any new evidence offered by a party, and makes findings based on the preponderance of the evidence."  *County Sch. Bd. of Henrico v. Z.P.*, 399 F.3d 298, 304 (4th Cir. 2005) (*citing* 20 U.S.C. § 1415(i)(2)(B)).  The reviewing court should make an independent decision based on the preponderance of the evidence, but give due weight to the state administrative findings.  *See Sch. Comm. of*

*Town of Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369 (1985); *Doyle v. Arlington County Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991).

In particular, the reviewing court should consider the factual findings in an IDEA state agency decision to be *prima facie* correct. *See Kirkpatrick v. Lenoir County Bd. of Educ.*, 216 F.3d 380, 385 (4th Cir. 2000). When factual findings are "regularly made," and thus entitled to a presumption that they are *prima facie* correct, the district court must explain any disagreements it has with or deviations it takes from those findings. *County Sch. Bd. of Henrico*, 399 F.3d at 304 (*citing Doyle*, 953 F.2d at 105). The Court must give due regard to the hearing officer's judgments as to the credibility of witnesses. *Doyle*, 953 F.2d at 104-05. Credibility determinations implicit in a hearing officer's decision are also entitled to deference. *County Sch. Bd. of Henrico*, 399 F.3d at 306-07 (*citing A.B. ex rel. D.B. v. Lawson*, 354 F.3d 315, 327-28 (4th Cir. 2004)). After giving the administrative factual findings their proper weight, "the district court is then free to decide the case on the preponderance of the evidence." *Doyle*, 953 F.2d at 105 (citations omitted). The party seeking to overturn a hearing officer's decision bears the burden of proof in showing that the decision was erroneous. *See Barnett v. Fairfax County Sch. Bd.*,

927 F.2d 146, 152 (4th Cir. 1991); *cf. Schaffer v. Weast*, 546
U.S. 49 (2005).

## III. Applicable Law

A. <u>The IDEA</u>

The purpose of the IDEA, 20 U.S.C. § 1400 et seq., is
"to ensure that all children with disabilities have available to
them a free appropriate public education that emphasizes special
education and related services designed to meet their unique
needs and prepare them for employment and independent living."
20 U.S.C. § 1400(d)(1)(A).  To achieve this purpose, the IDEA
extends federal funding to the states to provide disabled
schoolchildren with a FAPE.  *Id.* at § 1412(a)(1)(A).  A FAPE
requires a school district to provide educational services in the
so-called "least restrictive environment," i.e., the educational
environment suitable for the disabled student that is most
similar to the public school environment in which non-disabled
children are educated.  *Id.* at § 1412(a)(5); *Sch. Bd. of Prince
William County v. Malone*, 762 F.2d 1210, 1213 (4th Cir. 1985).

Where the public school district is unable to provide a
FAPE in the public schools, the IDEA requires the school district
to assume the cost of educating the child in a private school
that meets the child's educational and social services needs.
*Id.* at § 1412(a)(10)(B).  In some circumstances, parents may be
reimbursed for a unilateral private placement: "When a court or

7

hearing officer concludes that a school district failed to provide a FAPE and the private placement was suitable, it must consider all relevant factors . . . in determining whether reimbursement for some or all of the cost of the child's private education is warranted." *Forest Grove School District v. T.A.*, No. 08-305, slip op. at 17 (U.S. June 22, 2009).

The IDEA establishes detailed procedures for the development and review of the Individualized Education Program ("IEP"), a plan designed by a team consisting of school district educators and administrators, education experts, and, of vital importance, the child's parents.  If a dispute arises over the sufficiency of an IEP, the statute requires the parents to notify the school district of their complaints and enter into mediation. If mediation is unsuccessful, the law allows the parents to bring a due process action before an impartial state or local administrative hearing officer.  20 U.S.C. § 1415.  A party aggrieved by the decision of the hearing officer may file a civil action in a state or federal district court.  *Id.* at § 1415(i)(2).

B. A Free Appropriate Public Education

A FAPE "consists of educational instruction specially designed to meet the unique needs of the handicapped child . . . supported by such services as are necessary to permit the child to benefit from the instruction." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 188-89 (1982).  A FAPE is implemented through the IEP,

which "must contain statements concerning a disabled child's level of functioning, set forth measurable annual achievement goals, describe the services to be provided, and establish objective criteria for evaluating the child's progress." *M.M. ex rel. D.M. v. Sch. Dist. of Greenville County*, 303 F.3d 523, 527 (4th Cir. 2002); *see also* 20 U.S.C. § 1414(d)(1)(A).

The FAPE requirement is satisfied when a school district provides the disabled child with "personalized instruction with sufficient support services to permit the child to benefit educationally from the instruction." *Doyle*, 953 F.2d at 106 (*citing Rowley*, 458 U.S. at 203). To provide an "appropriate" education within the meaning of the IDEA, the school district does not have to provide the child with the best possible education. *M.M.*, 303 F.3d at 526. Once a FAPE is offered, the school district need not offer additional educational services. *Id.* That is, while a state must provide specialized instruction and related services sufficient to confer some educational benefit upon the disabled child, the IDEA does not require the furnishing of every special service necessary to maximize each disabled child's potential. *Id.* at 526-27.

Congress, however, "did not intend that a school system could discharge its duty under the [IDEA] by providing a program that produces some minimal academic advancement, no matter how trivial." *Hall ex rel. Hall v. Vance County Bd. of Educ.*, 774

F.2d 629, 636 (4th Cir. 1985).  Setting the substantive standard,
the Supreme Court has stated that an IEP is sufficient if it is
"reasonably calculated to enable the child to receive educational
benefits." *Rowley*, 458 U.S. at 207.  In making this
determination, a reviewing court must defer to educators'
decisions so long as the IEP at issue provides the child "the
basic floor of opportunity that access to special education and
related services provides." *See Tice ex rel. Tice v. Botetourt
County Sch. Bd.*, 908 F.2d 1200, 1207 (4th Cir. 1990) (*quoting
Rowley*, 458 U.S. at 201).

## IV. Findings of Fact

A. <u>The Student's Disabilities and History with the FCPS</u>

1.      The Student was born in the Soviet Union in 1989.  In
1993, she was adopted by Bill Hogan and Tatiana Grant.  Shortly
thereafter, the family moved to Fairfax County, Virginia.  While
the Student's parents divorced in 2001, they maintain a close
relationship and share joint legal custody of the Student.  (Hr'g
Dec. 3-4; Pls.' Mem. in Supp. 3.)

2.      In 1995, the Student began kindergarten in an FCPS
school, where her learning disabilities first came to light.  The
Student has a severe reading disability.  (Pls.' Mem. in Supp.
3.)  An initial "individualized education plan" ("IEP") was
completed, and the Student later moved to a second elementary
school.  (Hr'g Dec. 4.)  Her progress at the second school was

not satisfactory, and FCPS recommended placement at a private day school in Washington, D.C.  She attended the private day school for two years before her parents unilaterally placed her in a different private day school for the seventh and eighth grades. Although the school did not offer a ninth grade, the Parent decided to keep the Student enrolled at the second private day school for an additional school year – in 2004-2005 – after she completed eighth grade.  (Hr'g Dec. 4.)

3.      The last IEP completed for the Student before the present legal proceeding began is dated March 9, 2004; the IEP was deemed appropriate by an administrative hearing officer in a separate due process hearing.[3]  (Hr'g Dec. 4.)  That hearing officer stated that, if the Parent wanted FCPS to began a new IEP meeting for the 2005-2006 school year, he should contact an FCPS administrator to request an IEP meeting by March 15, 2005.  (A.R. 3 at 34.)

     B. The 2005-2006 School Year

4.      The Parent did not contact FCPS by March 15, 2005. FCPS sent him two letters, dated March 18, 2005 and June 21, 2005, inquiring whether he wanted FCPS to propose an IEP for the

---

[3] Subsequently, the Parent appealed the hearing officer's decision to this Court, and, on September 27, 2007, the parties entered a settlement agreement.  (A.R. 411 at 1.)  The settlement agreement stated, in part, that "the decision and order of the state administrative hearing officer shall be vacated insofar as it may place any limit on the Parent or Student with respect to their future conduct or communications with FCSB or with respect to any future IEP or placement decision."  (A.R. 411 at 3.)

2005-2006 school year.  (A.R. 4, 5.)  The Parent testified that
he sometimes had problems receiving mail and that he never
received the letters in question.  (Hr'g Dec. 5; A.R. 416 at
1015.)[4]  On August 26, 2005, the Parent contacted FCPS to ask
whether it planned to create an IEP for the 2005-2006 school
year.  (A.R. 43-44.)

5.      FCPS immediately acknowledged receipt of the Parent's
August 26 letter.  (Hr'g Dec. 5.)  On August 29, 2005, it sent
the Parent a letter informing him of FCPS's attempt to contact
him and noting that, given the timing of the Parent's letter –
which FCPS received less than two weeks before the start of the
2005-2006 school year – it would be difficult to arrange for
proper placement on the first day of school.  (A.R. 46.)  In the
interim, FCPS offered to place the Student pursuant to the March
9, 2004 IEP and informed the Parent that it would arrange for a
staff member to contact the Parent for a new IEP evaluation.
(A.R. 46.)

---

[4] Plaintiffs' pending motion to admit additional evidence centers in
part on the parties' dispute over whether the March 18 and June 21, 2005
letters were sent by FCPS and received by the Parent.  The Parent claims that
certain certificates of mailing generated for letters sent to him from April
2003 to February 2004 were not present for the March 18 and June 21, 2005
letters, and that this shows that the letters were not actually sent.  (Pls.'
Mot. to Allow Add'l Ev. Ex. A.)  After reviewing the testimony of the FCPS
administrator who authored the letters, in which he described the typical
process by which letters were written and mailed from his office, the Court
finds no reason to question the Hearing Officer's finding that the letters
were sent.  (A.R. 417 at 1349-57.)  It also does not credit Defendant's
argument that the Hearing Officer found that the Parent did receive the
letters.  The Hearing Officer specifically noted the Parent's testimony that
he did not receive the letters and did not make a specific finding that the
Parent did receive the letters.  (Hr'g Dec. 4, 5, 12.)

6.          On August 31, 2005, an FCPS Contract Service Specialist
("CSS"), Ms. Carmella Jackson ("Jackson"), contacted the Parent
to advise him that she had located an opening at a private day
school, the High Road School, where the Student's needs could be
addressed.  (Hr'g Dec. 5-6.)  The High Road School was, at that
time, a mostly all-male school for emotionally disturbed students
with behavior problems.  It was not an appropriate placement for
the Student.  The Parent rejected the offer of placement at the
High Road School.

7.          Through e-mails exchanged in late August and early
September, Jackson and the Parent set up an initial IEP meeting
for September 21, 2005.  (A.R. 48-66.)  At the meeting were both
of the Student's parents, an FCPS psychologist, two special
education specialists, and Jackson.  (Hr'g Dec. 6.)  The Student
was found to be learning disabled and eligible for special
education services.  (Hr'g Dec. 6-7.)  At the Parent's request,
FCPS agreed to accommodate the Student's dyslexia.  (Hr'g Dec.
7.)  The Parent also wanted FCPS to also classify the Student as
having a speech and language impairment; the FCPS psychologist
explained that such an additional classification was not
necessary to complete the Student's IEP, as FCPS very clearly
recognized the Student's speech and language processing problems.
(Hr'g Dec. 8.)  The Court agrees that no additional
classification was necessary.

8.      During the meeting, the FCPS psychologist requested updated psychological and educational tests.  (Hr'g Dec. 7.)   The Parent was concerned that additional testing might change the Student's eligibility.  (Hr'g Dec. 7.)  The Parent was given a Notice and Consent form by which he could consent to certain tests.  The form was never returned to FCPS during the 2005-2006 school year.  (Hr'g Dec. 7.)  On October 12, 2005, by e-mail, the Parent told the FCPS psychologist that he would authorize several of the requested tests, but not the requested psychological and educational tests.  (A.R. 103.)

9.      At the meeting, the Parent verbally notified the FCPS personnel present that he intended to unilaterally place his daughter.  (Hr'g Dec. 8; A.R. 416 at 1173-74.)  He provided the notice at the last IEP meeting the parties attended before the Student was enrolled at LMB.  The participants at the September 21 meeting tentatively scheduled a follow-up meeting for September 28, 2005.  However, the follow-up meeting never occurred, and no IEP for the Student was finalized during the 2005-2006 school year.  (Hr'g Dec. 9.)

10.     Without notifying FCPS that he was doing so, the Parent arranged for the Student to receive twelve weeks of instruction at the Lindamood-Bell Center ("LMB") from approximately November 2005 to March 2006.  (Hr'g Dec. 9.)  The Student did not receive any other formal educational services during the school year.

14

11.      On November 9, 2005, an FCPS employee contacted the Parent by express mail.  The employee, a Contract Services Coordinator, expressed his hope that the Student would still be able to attend school "in an appropriate classroom setting." (A.R. 128.)  The letter expressed concern about the Student not attending school, noted that the Parent had rejected the High Road School as an option, and offered to place her at Stuart High School "while evaluations are being completed."  (A.R. 128.)  The Parent did not pick up the signature-required letter from the Post Office and thus did not receive the offer in October.  He had previously told FCPS that receiving signature-required letters was difficult for him.  After the letter was returned to FCPS on December 12, 2005, FCPS did not attempt to contact the Student's parents again until the end of January, 2006. (Hr'g Dec. 14; A.R. 131, 135.)

12.      Jackson, who was the "point person" for the Student, was at times difficult to reach and unresponsive to e-mail.  On November 1, still attempting to schedule a follow-up meeting between the Parent and FCPS personnel regarding the Student, the Parent stated that he "look[ed] forward to hearing from you when your schedule permits."  (A.R. 124.)  Jackson never responded. On January 1, 2006, she retired from FCPS.  (A.R. 417 at 1188.) The November 1 e-mail from the Parent to Jackson was the

15

culmination of what can best be termed a breakdown in communication between the parties.

13.      Jackson testified that she believed that the Parent was using e-mail to "mak[e] a record of the fact that he has not talked to me." (A.R. 417 at 1278.) Additionally, most of her phone calls to the Parent went unanswered. (A.R. 417 at 1278.) The Court finds that the constrained manner in which both the Parent and Jackson made and accepted communications contributed to the breakdown in communication. It also finds, however, that the FCPS bears the ultimate responsibility for the final breakdown in communication. Jackson did not respond to the Parent's last e-mail and failed to restart a dialogue with the Parent in the two months before she retired.

14.      More than halfway through the 2005-2006 school year, Plaintiffs were put in touch with the new FCPS placement specialist responsible for handling the Student's case. The parties subsequently reached an agreement that led to the Student's enrollment at Accotink Academy, a private school for students with disabilities, after the 2005-2006 regular school year had ended. (A.R. 362; 372.)

     C. Educational Program After the 2005-2006 School Year

15.      Beginning during the summer of 2006 and through the date of the Hearing, the FCPS provided special education for the Student at Accotink Academy. (A.R. 362; Hr'g Dec. 28.) At

16

Accotink, the Student has received extensive reading instruction, including small-group reading instruction and private reading services.  Experts who worked with the Student agreed that she was receiving approximately the maximum amount of reading instruction that was beneficial.  (A.R. 414 at 97-99; A.R. 415 at 8.)

     D. <u>The Offer of Judgment and the Due Process Hearing</u>

16.        The Parent filed his request for a due process hearing on October 1, 2007.  (A.R. 418.)  On October 31 – before the hearing started – the FCPS made an Offer of Judgment of $29,000.00 for all claims against the FCPS and its employees by Plaintiffs and the Student's mother (the Parent's ex-wife).  The offer was for more than the sum of (1) Plaintiffs' attorneys fees at the time the offer was made and (2) the amount ultimately awarded by the Hearing Officer.  Plaintiffs turned down the offer, which they now claim was not a valid offer of judgment under IDEA law for two reasons: first, it asked for the release of other potential claims in addition to the IDEA-based complaints, and second, it asked for the release of claims by the Student's mother, a non-party.

17.     During the hearing, which lasted four days, the Hearing Officer heard the testimony of 13 witnesses and more than 400 exhibits.  He issued a decision on December 16, 2007.  The

decision (the "Hearing Decision") included findings of fact and conclusions of law.

    E. <u>The Hearing Officer's Decision</u>

18.      The Hearing Officer's decision faulted both the FCPS and the Parent for the failure of the FCPS to provide a FAPE for the Student during 2005-2006. He found that, "from 26 September 2005 to April 2006, communications between FCPS and the father became highly problematic, i.e., some communications went unanswered for inordinately long periods of time, requests for information were not fully responded to, and information that could have been helpful was not provided." (Hr'g Dec. 9-10.)

19.      The Hearing Officer believed that FCPS was meeting its obligations under IDEA law until the case was transferred to Jackson, the CSS who retired mid-way through the 2005-2006 school year. (Hr'g Dec. 12.) Jackson "seem[ed] to have allowed herself to become more removed from the student's placement" and more concerned about the Parent's purported attempt to make a legal record than with placing the Student. (Hr'g Dec. 13.) The Hearing Officer found that the evidence demonstrated "a failure on the part of [Jackson] to even attempt to maintain a meaningful contact with the father after the 21 September 2005 meeting." (Hr'g Dec. 19.) As noted above in Finding of Fact **[]**, the Court agrees with the Hearing Officer that, while both sides contributed to the breakdown in communications, Defendant bears

the majority of the responsibility for the gap in time before the
parties recommenced communication.

20.      The Hearing Officer also laid part of the blame for the
failure to settle on an IEP and provide a FAPE on the Parent.  He
noted that, while the Parent was obviously deeply engaged in
providing for the Student's educational well-being, the Parent
"has become so focused on [the Student's] reading deficit, that
he has set aside her education in virtually every other
scholastic area of endeavor."  (Hr'g Dec. 16-17.)  Moreover, the
Hearing Officer found that while "[t]he record is replete with
references to requests for consent to test the student; the need
for testing; the types of tests, and statements that the tests
would be beneficial in placing the student," the Parent "neither
consented to such testing during the 2005-2006 school year
process" nor informed FCPS of tests he could provide to its
personnel.  (Hr'g Dec. 17.)  The Hearing Officer also faulted the
Parent for limiting his contact with FCPS and for contacting
Fairfax County's Family Assessment and Planning Team ("FAPT") to
request funding while repeatedly asking FAPT representatives not
to notify FCPS of his requests.  (Hr'g Dec. 18.)  The Hearing
Officer found that the Parent added to the already-existing
communications problems by refusing his consent to test the
Student, because of his "unreasonable and purposeful refusal" to
specify what tests he could provide FCPS, and because of his

19

"unreasonable and dilatory communication activities."  (Hr'g Dec.
19.)  The Court concurs in the Hearing Officer's conclusion that
the Parent's actions, though they may have been well-meaning,
were at times obstructive; it also concurs in the finding that
the Parent bears some responsibility for the non-provision of a
FAPE.

21.      Applying the factual findings to the legal framework of
the IDEA, the Hearing Officer found that FCPS personnel were
partly responsible for the failure to provide an appropriate IEP
and failed in part to provide a FAPE.  (Hr'g Dec. 20-22.)  He
agreed with Plaintiffs that the LMB, while "not a school in any
sense of the definition," did provide instruction that benefitted
the Student and thus was an appropriate placement.  (Hr'g Dec.
22.)  Defendant does not contest this finding.

22.      The Hearing Officer decided that the Parent was
eligible for reimbursement of the expenses incurred in sending
the Student to Lindamood-Bell for 12 weeks.  However, based on
his finding that the Parent refused to consent to testing,
withheld test results, limited his communications with FCPS, and
failed to retrieve at least one important letter from FCPS, the
Hearing Officer reduced the reimbursement by one-third.  (Hr'g
Dec. 24-26.)  He did so pursuant to 20 U.S.C. § 1412
(a)(10)(C)(iii)(III), which states that "[t]he cost of
reimbursement . . . may be reduced or denied – (III) upon a

judicial finding of unreasonableness with respect to actions taken by the parents."

23.      Next, the Hearing Officer appeared to agree that compensatory education would normally be available as a remedy for the Student's missed year of school: "From a review [of cases on "compensatory education"], it appears that compensatory education is to be provided where a child, who was found eligible for services under the IDEA, didn't receive those services due either to an inappropriate IEP, or a failure on the part of a school district to properly implement the . . . IEP."  (Hr'g Dec. 27-28.)  He calculated that, under normal circumstances, the Student would be awarded 2.5 months of compensatory education in the area of reading and language.  (Hr'g Dec. 30.)

24.      The Hearing Officer acknowledged that he had not found legal authority addressing the award of compensatory education in a situation in which a parent's actions contributed to the failure to provide a FAPE.  (Hr'g Dec. 28-29.)  He found that he could not "set aside" the unreasonable actions of the Parent or the fact that the March 2004 IEP was in place and available because "to do so would be to open a door to too many unforeseen consequences."  (Hr'g Dec. 30.)  On those grounds, the Hearing Officer denied the request for compensatory education.  The Court finds that the Hearing Officer did not properly support the denial of compensatory education.

## V. Conclusions of Law

Plaintiffs bear the burden of establishing that the Hearing Officer's decision was erroneous. *See Barnett v. Fairfax County Sch. Bd.*, 927 F.2d 146, 152 (4th Cir.), *cert. denied*, 502 U.S. 859 (1991).  They claim that the Hearing Officer, in denying full reimbursement and compensatory education, failed to apply the correct legal standards and used a version of the facts unsupported by the record.  Defendant asks the Court to uphold the Hearing Officer's findings and conclusions.  Even if any of the findings were improper, it claims, there is enough evidence in the record for the Court to sustain both the reduction in reimbursement and the denial of compensatory education.

A. <u>Reimbursement for the Private Placement</u>

Plaintiffs first suggest that the Hearing Officer did not have the statutory authority to order a reduction in reimbursement.  Next, they argue that the Hearing Officer's factual findings were not "regularly made" and thus are not subject to the judicial presumption that they are *prima facie* correct.  In fact, Plaintiffs claim, the evidence in the record contradicts each of the findings that the Hearing Officer relied on to reduce the reimbursement by one-third.  They also argue that the Hearing Officer did not apply the correct legal standard when he reduced reimbursement based on the evaluation and testing

22

delays purportedly caused.  Finally, they claim that, even if the findings were "regularly made," they are erroneous.

1. <u>Whether the Hearing Officer Had Statutory Authority to Order a Reduction in Reimbursement</u>

Plaintiffs' first argument relies on an incorrect interpretation of § 1412 of the IDEA.  They claim that the Hearing Officer did not have the statutory authority to invoke the provision of the IDEA that allows for a reduction based on unreasonable action taken by a student's parents.  (Pls.' Mem. in Supp. 14.)  The applicable subsection, 20 U.S.C. § 1412(a)(10)(C)(iii)(III), states that "[t]he cost of reimbursement . . . may be reduced or denied . . . upon a judicial finding of unreasonableness with respect to the actions taken by the parents."

The phrase "judicial finding," Plaintiffs argue, limits the authority to make a reimbursement reduction to the courts rather than to the state administrative officers who preside over due process hearings.  Because the Hearing Officer is not a "judicial" officer, they claim, his decision here was *ultra vires*.  (Pls.' Mem. in Supp 14 n.4 (*citing*, *inter alia*, Black's Law Dictionary 862 (8th ed. 2004) (defining "judicial")).)

Plaintiffs cite no case law to support this position.  This is unsurprising, because hearing officers routinely take the actions of parents into consideration when they make decisions

23

about equitable compensation under the IDEA.  *See, e.g.*, *C.G. v. Five Town Community Sch. Dist.*, 513 F.3d 279, 287 (1st Cir. 2008) (approving a finding by both the district court and the hearing officer that the parents acted in an unreasonable manner that justified denying reimbursement); *see also M.S. v. Mullica Twp.*, 263 Fed. Appx. 264 (3d Cir. 2008) (same).

The subsection from which subpart (III) is drawn specifically states that "a court *or a hearing officer* may require the agency to reimburse the parents for the cost" of enrollment where there was a failure to provide FAPE.  20 U.S.C. § 1412(a)(10)(C)(ii) (emphasis added).  It is clear, then, that the statute contemplates the hearing officer occupying the initial role in which judicial "findings" on reimbursement are made.  It would make little sense to force a school district that believed parents had acted unreasonably to hold its tongue through the administrative hearing and wait until after the hearing officer ordered reimbursement to make that argument on appeal to a district court.  In theory at least, Congress structured the IDEA to resolve as many disputes as possible as early in the sometimes-cumbersome review process as possible.

Additionally, the phrase "judicial finding" in § 1412(a)(10)(C)(iii)(III), which at first seems anomalous when compared to the other two subparts of § 1412(a)(10)(C)(iii), neither of which contain the word "judicial," makes sense when

24

one looks at the entirety of the subsection regarding limitations
on reimbursement.  The other two statutory justifications for
denying or reducing reimbursement in the applicable subsection
are based on the facts alone, *see id.* at
§ 1412(A)(10)(C)(iii)(I)-(II); only the third factor justifying a
denial or reduction requires a "finding" that is "judicial" in
nature – that is, one that requires the discretion of an
individual who occupies the judicial role and acts as more than a
mere fact-finder.  At the administrative level, that individual
is the hearing officer.  The Court rejects Plaintiffs'
proposition that the Hearing Officer acted in an *ultra vires*
fashion when he reduced the reimbursement award.

2. <u>Whether the Hearing Officer's Factual Findings Were</u>
<u>"Regularly Made"</u>

Plaintiffs next argue that the Hearing Officer's
findings of fact were not "regularly made" and thus that the
Court cannot accept them as *prima facie* correct.  The Court does
not agree.  The Hearing Officer's factual findings were
"regularly made."  The Fourth Circuit has explained that, "in
determining whether a hearing officer's findings were regularly
made, our cases have typically focused on the *process* through
which the findings were made: factual findings are not regularly
made if they are reached through a process that is far from the
accepted norm of a fact-finding process."  *J.P. v. Hanover*

25

*County*, 516 F.3d 254, 259 (4th Cir. 2008) (internal quotation and citation omitted) (emphasis in original).

Here, as in *J.P.*, "there is nothing in the record suggesting that the hearing officer's process in resolving the case was anything other than ordinary." *Id.* A proper hearing was held; witnesses from both sides testified and were cross-examined; voluminous exhibits were submitted; and the hearing officer was fully engaged in the process. *See id.*; *see also Fairfax County Sch. Bd. v. Knight*, 2006 U.S. Dist. LEXIS 96337, at *20 (E.D. Va. Aug. 23, 2006), *aff'd*, 261 Fed. Appx. 606 (4th Cir. Jan. 16, 2008). The Court will not reject the Hearing Officer's findings as not "regularly made."

3. Testing the Student

One of the factors the Hearing Officer weighed in finding parental unreasonableness was the lack of consent from the Parent to the additional testing and evaluation requested by the school psychologist present at the September 2005 IEP meeting. (Hr'g Dec. 24.)

Plaintiffs argue that, first, a reimbursement reduction based on a problem with a student evaluation must be made pursuant to 20 U.S.C. § 1412(A)(10)(C)(iii)(II), which allows for a reimbursement reduction or denial when, in certain situations, the school informs the parents of its intent to evaluate the child and the "parents did not make the child available for such

evaluation."  Because this subsection allowing for a
reimbursement reduction for testing-related problems is more
specific than the general allowance for a reduction or denial
based on "a judicial finding of unreasonableness" at subsection
(a)(10)(C)(iii)(III), Plaintiffs claim, it must be the only part
of the statute that allows a testing-related reduction in
reimbursement: the specific controls the general.  And subpart
(II) requires the school to inform the parents of the need for
testing "through the notice requirements described in section
1415(b)(3) of this title," which mandates a detailed and lengthy
written notice to the parents – a written notice that the Parent
claims the FCPS never provided.  Thus, Plaintiffs argue, any
failure to consent to testing on the Parent's part cannot support
a finding of "unreasonableness" under subpart III.  20 U.S.C.
§ 1412(a)(10)(C)(iii)(III).

       This argument also falls short.  Subsection (II) to 20
U.S.C. § 1412(A)(10)(C)(iii) applies, by its terms, only "prior
to the parents' removal of the child from the public school."
Here, the Student had stopped attending public school years
before the 2005-2006 controversy.  By the summer of 2005, she had
been unilaterally placed at a private day school for three years.
The wording of the statute shows that it was meant to cover the
situation in which a student at a public school is switched out
of the public school system after the school asks to evaluate him

27

or her.  That did not occur in this case; here, the dispute centers on the *re-entry* of the student into the school system. The Court finds that any unreasonableness on the part of the Parent regarding requested testing and evaluations may support a finding of "unreasonableness" under subpart (III).  If the Parent acted unreasonably in refusing to allow the FCPS to test the Student, in a manner that contributed to the loss of a FAPE during the 2005-2006 school year, the reduction in reimbursement may be justified.

Here, the facts show that the Parent was given a consent form for further testing but did not return it to FCPS. (A.R. 415 at 564, 567.)  The school psychologist testified that updated psychological and educational tests are important to properly placing a student who has been out of the school system for an extended amount of time.  (A.R. 415 at 610-12.)  The Court accepts this conclusion.  It finds that, while the Parent did consent to several of the requested tests – those for auditory and visual perception, among others – he was not fully cooperative regarding the additional requested educational and psychological testing.[5]  The school psychologist testified that

---

[5] Plaintiffs also claim that the testing could not have been crucial to the IEP process because the FCPS was prepared to go forward with IEP meetings before testing could be completed.  It may be true that updated tests were not strictly required to form a new IEP, especially given the compressed time schedule under which the parties were originally working.  Testimony suggested, however, that the FCPS did want updated test results to form a more accurate picture of the Student's disabilities.  (A.R. 415 at 607.)  And updated test results could have helped the FCPS provide a FAPE even after the

28

those tests were needed to determine the "appropriate disability category" for the Student.   (A.R. 415 at 607.)

### 4. Causal Connection Between Testing and Loss of FAPE

Plaintiffs are on stronger ground when they question the causal connection between the difficulties the Parent may have contributed to the testing process and the loss of FAPE. They claim that the loss of FAPE was caused almost wholly by the FCPS's negligence in scheduling a timely IEP meeting and by the fact that the Student fell through the bureaucratic cracks in late 2005 and early 2006.  As the Court noted above, the majority of the blame for the non-placement of the Student does lie with the FCPS.

Plaintiffs' argument ignores the fact that several discrete actions, none of which could be called so unreasonable that it would justify reducing reimbursement on its own, can lead, in the aggregate, to a finding of unreasonableness.  Here, while the Parent's lack of immediate cooperation on certain testing issues did not singlehandedly derail the IEP process, it is one of several examples of obstructive or uncooperative parental behavior.  The Parent was difficult to reach by mail or by phone, *see* A.R. 65, and he acted secretively in discussions

---

parties had completed, on an abbreviated basis, an IEP meant to put the Student back into the school system before too much time had elapsed. Unfortunately, neither the testing nor the IEP was completed.

with a different Fairfax County entity, the FAPT.[6]  Additionally,
reading the e-mails and letters exchanged between the Parent and
other FCPS personnel leads to the inescapable conclusion that the
Parent was communicating, from the start of the new IEP process,
with an eye toward creating a record.  *See, e.g.*, A.R. 12; A.R.
65.  It may be argued that, given the Plaintiffs' past experience
with the FCPS, which included litigation, the Parent was simply
being overly cautious.  Regardless of the reason, the Court finds
that the Parent's communications with FCPS personnel were pre-
emptively adversarial in tone and contributed to the lack of true
cooperation, and the ultimate breakdown in communication, between
the parties.  The Hearing Officer, who heard all of the evidence
through live testimony and was able to evaluate the credibility
of the witnesses, was obviously impressed with the Parent's
"unreasonable . . . communication activities."  (Hr'g Dec. 19.)
The Court agrees with this assessment.

     This is not to lay the blame entirely, or even mostly,
at the feet of the Parent.  It is clear from the record that FCPS
personnel were ultimately responsible for the failure to provide
a FAPE for the Student.  The Parent's actions may have made the

---

[6] The difficulty that the FCPS had in reaching and scheduling meetings
with the Parent makes it improper and inequitable to blame the FCPS for
missing the "statutory deadline" for developing an IEP.  (Pls.' Supp. Br.)
The Parent did not respond to two letters sent over the summer by the FCPS.
The FCPS initiated the IEP process soon after it received the Parent's request
for a meeting.  As explained above, the FCPS's difficulty in communicating
with the Parent exacerbated its own poor performance in staying in touch with
the Parent.

IEP process more fraught, but they did not single-handedly derail it.  After a period of engagement between the parties, the Student's case fell into a bureaucratic morass – one that could have been avoided on numerous occasions, including, for example, when the Parent failed to pick up what turned out to be the November 9, 2005 letter that could have re-started the placement process and, more importantly, when Jackson failed to respond to repeated inquiries from the Parent.

The Parent has attempted to explain away nearly all of the obstructions for which the Hearing Officer found him to be at least partly responsible.  Taken together, though, his actions in this case – including a method of communication that made cooperation more difficult and his refusal to consent to several requested tests – partially obstructed the IEP process.  If the Parent had been fully cooperative, easier to communicate with, and more amenable to providing the requested testing, it is much less likely that the Student would have had only twelve weeks of instruction during the 2005-2006 school year.  On the other hand, FCPS, intentionally or not, let the Student fall off of its proverbial radar screen.  Even considering the at-times unreasonable actions of the Parent, the onus to provide a FAPE lay with the FCPS, not the Parent.

Decisions on reimbursement reduction are equitable, and as such are not reducible to a set formula.  The Court finds that

the Hearing Officer correctly determined that some reduction in reimbursement is justified.  However, the Court believes that the Hearing Officer focused too narrowly on the Parent's failures in what was obviously a frustrating and emotionally difficult series of decisions regarding the education of his child.  The Court finds that a one-sixth reduction, rather than a one-third reduction, better reflects the Parent's contribution to the Student's non-attendance at school during the 2005-2006 school year.

    B. Compensatory Education

        1. Legal Justification for Compensatory Education

        An award of "compensatory education" – defined as "educational services ordered by the court to be provided prospectively to compensate for a past deficient program" – "may be 'appropriate relief'" under the IDEA.  *G. v. Fort Bragg Dependent Schools*, 343 F.3d 295, 308-09 (4th Cir. 2003) (citations omitted).  The remedy of compensatory education "involves discretionary, prospective, injunctive relief crafted by a court to remedy . . . an educational deficit created by an . . . agency's failure over a given period of time to provide a FAPE to a student."  *Id.* at 309.

        In the administrative proceeding, the Hearing Officer implied, incorrectly, that compensatory education is *required* when the school district fails to develop an IEP and provide a

32

FAPE.  (Hr'g Dec. 27 ("From a review of the aforementioned cases . . . it appears that compensatory education *is to be provided* [when there is a failure to develop or implement an IEP].") (emphasis added).)  The Fourth Circuit's decision in *Fort Bragg* does not create an unimpeachable right to compensatory education.  It states that the award of compensatory education is "discretionary" and that the IDEA "permits an award of such relief in some circumstances," not that the Act always requires the remedy or that it should be automatically awarded, as the Hearing Officer appears to have assumed.

### 2. Decision of the Hearing Officer

The Hearing Officer found that, barring all of the unusual circumstances in this case and considering only the naked violation of FCPS's responsibility to provide a FAPE, the Student would normally be "entitled" to 2.5 months of compensatory education.[7]  (Hr'g Dec. 29-30.)  Then, taking into account the previously-found "unreasonable actions of the [Parent]" and the Parent's nearly exclusive focus on reading and language in placing the Student with the Lindamood-Bell program, the Hearing Officer denied the request for compensatory education.

---

[7] In support of his finding on compensatory education, the Hearing Officer cited *M.C. ex rel. J.C. v. Cent. Reg'l High Sch.*, 81 F.3d 389 (3d Cir. 1996).  He calculated the amount of compensatory education as 2.5 months because that is the amount of time that elapsed between November 9, 2005, when the FCPS realized that the Student was not attending school, and January 31, 2006, when it assigned a new CSS to the Student's case.  (Hr'g Dec. 26-27, 29-30.)

Plaintiffs complain that this summary denial was made on an improper basis.  The Parent argues that whether a child is entitled to compensatory education should not turn on the action of his or her parents.

The Fourth Circuit's holding in *Fort Bragg*, however, does not imply that a school system must be responsible for the compensatory education expenses of a hypothetical student who did not receive a FAPE largely because of the actions of the student's parents.  (In *Fort Bragg*, the issue did not arise because it was the school district, not the parents, that caused the denial of a FAPE.)  Other courts have considered the actions of the parents in fashioning this form of equitable relief.  *See Parents of Student W. v. Puyallup Sch. Dist., No. 3*, 31 F.3d 1489, 1497 (9th Cir. 1994) (stating, in its discussion of compensatory education, that "[t]he behavior of Student W.'s parents is also relevant in fashioning equitable relief.").

Plaintiffs' eloquent argument that the sins of the father should not be visited on the child, *cf.* Exodus 20:5, has intuitive appeal.  But the equitable nature of compensatory education demands a close look at the actions of all parties involved in the denial of a FAPE.  The benefit of compensatory education inures to the child; the burden – the cost of providing the compensatory education – is borne solely by the school district.  But the child and the school district are not the only

34

active agents in an IDEA case, and a refusal to recognize the effect that parents may have on the IEP process could unfairly burden the school district.  Stated differently, placing the entire burden for compensatory education on the school district when it was only partially at fault would not result in a "windfall" to the student, who is, after all, the passive victim. It could, however, unfairly penalize a school district that was only partially responsible for the denial of a FAPE.  A school district should not be presumptively responsible for compensating lost education directly attributable to the actions of parents.

That said, the Court agrees with Plaintiffs that the Hearing Officer's decision to summarily deny compensatory education – after finding that FCPS had denied the Student a FAPE – was improper and not supported by the facts.  The Hearing Officer, after all, reduced the reimbursement to the Parent by just one-third after finding that he had acted "unreasonably." Analyzing the request for compensatory education, the Hearing Officer first found that the remedy would normally be appropriate, but then rejected the *entire* request based largely on the same actions of the Parent.  Such a rejection cannot be upheld on the thin rationale given by the Hearing Officer, who stated only that he could not "set aside . . . the unreasonable actions of the father," and that "[t]o do so would be to open a door to too many unforeseen consequences."  (Hr'g Dec. 30.)  The

35

Court finds that the Hearing Officer's decision to deny compensatory education outright was reached without appropriate legal support.

As Defendant points out, however, this Court can draw its own conclusions based on the evidence in the record.  The Court is not bound by the reasoning of the Hearing Officer and can affirm the holding in the administrative proceeding without relying on the rationale used by the Hearing Officer.  It will not do so in this case.

### 3. Burden of Proof on Compensatory Education

The parties dispute the burden of proof for an award of compensatory education.  Defendant suggests that Plaintiffs, who bear the burden of proof when challenging adverse findings by the Hearing Officer, must provide evidence to show that the Student is in need of compensatory education.  Plaintiffs counter this by emphasizing the Hearing Officer's finding that the Student would normally be entitled to 2.5 months of compensatory education. Plaintiffs argue that, if the Court rejects the Hearing Officer's summary rationale for denying compensatory education, the burden shifts in their favor: what remains is the finding that 2.5 months of compensatory education is otherwise appropriate.  Thus, they claim, Defendant now bears the burden of showing that compensatory education is *not* appropriate.

36

This is only half right.  While the Court does reject the Hearing Officer's rationale for denying compensatory education, it also rejects what appears to have been the Hearing Officer's assumption that the denial of a FAPE translates automatically into an award of compensatory education as of right.  Both parties, then, are back to square one.  Plaintiffs still bear the burden of proving that compensatory education is an appropriate equitable remedy that the Court should award in the particular circumstances of this case.

4. <u>Whether Compensatory Education is Appropriate</u>

Plaintiffs argue for an award of compensatory education based on a mathematical calculation of the number of school weeks the student missed in 2005-2006.  "Rotely awarding a block of compensatory education" equal to the amount of lost instructional time is an inappropriate method for awarding the equitable remedy of compensatory education.  *See Puyallup School District*, 31 F.3d 1489, 1497 (9th Cir. 1994) (rejecting the argument that, if a student loses a certain amount of special services, he is "*ipso facto* . . . entitled to an equal amount of compensatory education" without a "showing that a general award of unspecified one and one-half years of compensatory education [is] appropriate").  Instead, an award of compensatory education requires the Court to find that the amount requested is appropriate considering all the circumstances.

37

After reviewing the facts about the effect that the lost 2005-2006 school year had on the Student, the Court finds that Defendants have submitted compelling evidence that the Student has received a substantial increase in reading and language instruction since December 2006, after she enrolled at Accotink Academy – an increase that partially offsets the deficits she incurred from the loss of a FAPE in 2005-2006. (Def.'s Ltr. of June 17, 2009.)

The Court agrees that FCPS has to some extent "redoubled its efforts" to assure that, beginning in December 2006, the Student receives "intensive, individualized (and small group) instruction." (Def.'s Mem. in Supp. 20; Def.'s Ltr. of June 17, 2009.)  In fact, several experts who worked with the Student agreed that, with two hours each day of individual reading instruction, the Student was receiving approximately the maximum amount of intensive reading instruction that she can handle.  (A.R. 414 at 97-99; A.R. 415 at 8.)  That evidence suggests that any additional daily hours of intensive reading instruction may yield diminishing returns.  One FCPS witness testified that the extra reading instruction resulted in part from the Student's non-attendance during the 2005-2006 school year.  (A.R. 414 at 231-32.)  While Plaintiffs contest Defendant's argument that some of the additional reading was meant to counteract the effects of the missed school year, *see*

38

Pls.' Opp'n 23 (citing testimony of FCPS employee Mel Ishi, A.R. 417 at 1436), they do not contest the fact that the Student has made measurable progress as a result of the increased reading instruction provided by FCPS after the missed school year.

Plaintiffs' argument for compensatory relief relies mainly on the common-sense proposition that a missed year of school must have had some deleterious effect on the Student that compensatory education will go some way toward remedying.  (Pls.' Opp'n 22 ("when [the Student] began the next regular school year, 2006-07, she was in ninth grade but still reading at a second and third grade level.  Surely, she would have been further along if she had not lost that year . . . .").)  While a court may be free to agree with such an assumption, the statement betrays the dearth of tangible evidence showing a precisely measurable need for the equitable remedy of compensatory education.  The lack of regular and comparable testing of the Student makes the argument especially difficult to evaluate.

In their reply brief,[8] Plaintiffs attempt to counter FCPS's evidence that it has provided an intensive education since 2006 that serves to compensate for the lack of a 2005-2006 school year; Plaintiffs also suggest several additional justifications

_____

[8] In their reply brief, Plaintiffs also revise their request for compensatory education.  Rather than a mechanical hour-by-hour calculation for additional services at Lindamood-Bell, they now agree that as an "alternative remedy," they would "welcome an interim order requiring the parties to meet and confer to develop a plan for compensatory education."  Pls.' Reply at 13-14.

for compensatory education.  First, they again claim that the harm of missing the bulk of the 2005-2006 school year – with the exception of the 12 weeks spent at LMB – "speaks for itself." (Pls.' Reply 12.)  Next, they note that when the Student began her studies at Accotink Academy in 2006, she was placed in the ninth grade – the same grade she was in during the 2004-2005 school year.  This, Plaintiffs suggest, supports the Student's "documented history of regression over extended breaks."  (Pls.' Reply 12 (*citing* A.R. 375 at 17).)[9]

Even considering FCPS's admirable efforts to strengthen the Student's reading and language instruction in the wake of her loss of a FAPE, and looking at the totality of the evidence submitted, the Court finds that the Student is entitled to some level of compensatory education.  First, based on the Court's findings above, the FCPS bears a significant amount of the responsibility for the Student's failure to receive a FAPE during the 2005-2006 school year.  Second, the loss of a FAPE created an "educational deficit."  *Fort Bragg*, 343 F.3d at 309.  In 2007,

---

[9] Plaintiffs also claim that the IEP that the parties finally completed in December 2006 shows an expectation that, even with the additional reading services provided by FCPS, the Student will move from a 2.4 grade level to a 3.5 grade level on "decoding" after one year, and a 3.8 grade level to a 4.8 grade level on "comprehending" after one year.  This expectation of progress, they claim, is not sufficient to make up for lost time.  (Pls.' Reply 12.) This argument is somewhat problematic.  If the Student did move, for example, from a 3.8 to a 4.8 grade level on comprehension within one year, that full-year jump in grade level mathematically outpaces prior performance for a student who remains at an approximately fourth-grade level after more than ten years of education.  The Court does not rely on this argument in finding that some compensatory education is justified.

the Student's IEP team noted its agreement that the Student "will regress in her academic skills" if not enrolled in an extended school year program.  (A.R. 375 at 2.)  If the Student was in danger of regression over a summer, she must have experienced some regression after the loss of almost an entire academic year. Third, the FCPS did not begin providing "extra" instruction until December 2006, more than one year after the Student began her twelve-week stint at LMB.  Finally, the possibility that additional instruction will yield "diminishing returns" does not dissuade the Court from finding that some compensatory education is necessary.  Any compensatory education that the Court grants does not have to take place on top of what the Student is already receiving through the updated IEPs.  *See Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 249 (3d Cir. 1999) (recognizing the appropriateness, in some circumstances, of an award of compensatory education beyond age 21).

Considering all of the circumstances in this case, the Court finds that an award of eight weeks of summer-level education is an appropriate equitable compensation for the Student's loss of a FAPE during the 2005-2006 school year.  The award takes into account the behavior of the parties, the evidence that the Student regresses when not in an academic environment, and Defendant's efforts, since the 2006-2007 school

41

year, to make up the deficit for which it was largely
responsible.

        The eight weeks of compensatory education shall be
delivered by the school that the Student is currently attending
or by a school or service provider mutually acceptable to all
parties.  That is, if the parties cannot agree on a school or
service provider, the default provider will be the school the
Student is currently attending.  The amount of instruction that
the Student shall receive per week shall be equal to the average
amount of weekly academic instruction provided to the Student
during the last three summers in which she received extended
school year instruction.  At least half of the compensatory
education shall be provided in a one-on-one format; the FCPS may
provide more than half in a one-on-one format at its option.  The
instruction provided shall be primarily in the areas of reading
and language comprehension, or as mutually agreed upon by the
parties.  If the parties cannot mutually agree on the details of
the compensatory instruction, Defendant's program shall be
approved upon a showing that it is providing instruction
primarily in the areas of reading and language comprehension.  If
the addition of compensatory instruction would lead to more than
two hours per day of one-on-one instruction, Defendant, at its
option, may move the "excess" one-on-one instruction to the
summer after the Student finishes the twelfth grade or the summer

after she turns twenty-one.  The compensatory education shall be provided during a time mutually agreeable to the parties.  It does not have to be provided in one eight-week block, but it shall not be provided in less than one-week blocks unless both parties agree otherwise.  The parties may modify these guidelines by joint agreement.

The Court will direct the parties to meet and confer, in a spirit of cooperation, to work out the details of a compensatory education plan consistent with the guidelines given above.  Within thirty days after the date of entry of the order accompanying this memorandum opinion, the parties shall provide the Court with an estimate of the cost of their compensatory education plan.  The Court will take this cost into account when it considers Plaintiffs' request for attorneys' fees.  None of the following will prejudice either party's ability to appeal the merits of this decision and none of the following can be used against it in any subsequent proceeding in this case: the formation of a compensatory education plan, the estimate of the cost of that plan, the plan negotiations, or the contents of the plan.

C. Attorney's Fees

The IDEA allows courts to award, in their discretion, "reasonable attorneys' fees as part of the costs— (I) to a prevailing party who is the parent of a child with a disability."

20 U.S.C. § 1415(i)(3)(B).  While Plaintiffs did not receive all of the relief they requested, the partial relief they have received makes them prevailing parties in this action.  They may therefore be entitled to recover reasonable attorneys' fees from Defendant.  Because the Hearing Officer and this Court have awarded relief worth more than the "offer of judgment" that Plaintiffs turned down before the Hearing, that offer will not foreclose an award of fees.  *See* 20 U.S.C. § 1415(i)(3)(D)(i).

In October 2008, Plaintiffs moved to bifurcate their claim for attorneys' fees (Count III) from their claims for reimbursement and compensatory education (Counts I-II).  The Court, in what was perhaps an overly optimistic view of the ease with which relief could be awarded, denied the motion and found that it would be able to decide the merits of Counts I-II and simultaneously "perform a mathematical calculation of attorney's fees."  (Mem. Op. of Nov. 11, 2009, at 4.)  Because the Court will direct the parties to meet and confer in order to provide an estimate of the cost of the relief it has provided – an estimate that will help the Court determine the degree of success the Plaintiffs obtained in relation to the fees they expended – it finds it appropriate to defer a consideration of attorneys' fees. Plaintiff may file a motion for attorneys' fees after thirty days from the date of entry of the order that accompanies this

44

memorandum opinion and before forty-five days from the date of entry of the order that accompanies this memorandum opinion.

     D. <u>Motion to Allow Additional Evidence</u>

       On January 14, 2009, Plaintiffs moved for the admission of additional evidence pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii). They ask for the admission of exhibits: (1) a stipulation regarding the award of attorneys' fees; (2) a declaration of the Parent, including several attachments; (3) certain e-mail records of the FCPS produced after the Hearing; and (4) any testimony offered in response to objections by the FCPS to Plaintiffs' request for attorneys' fees.  Defendant objects to the admission of (1) ¶ 12 of the Parent's declaration and the related attachments, and (2) any testimony offered by Plaintiffs' attorneys in response to Defendant's arguments about the reasonableness of the claimed attorneys' fees.  Because they are not objected to and are proper for consideration by the Court, the Court will admit exhibits (1) and (3).

       The Fourth Circuit has embraced a "strict approach" to the admission of additional evidence related to issues that could have been raised at the administrative hearing.  *Springer v. Fairfax County Sch. Bd.*, 134 F.3d 659, 666-67 (4th Cir. 1998).

1. <u>Paragraph 12 of the Parent's Declaration and Related</u>
<u>Exhibits</u>

Plaintiffs ask the Court to admit a statement by the Parent that seven letters he received from the FCPS between April 2003 and February 2004 contained "certificates of mailing." (Hogan Decl. ¶ 12 & Exs.)  These should be admissible, Plaintiffs claim, because two of the letters that the FCPS claims to have sent him in 2005 did not contain "certificates of mailing," which makes it less likely that the FCPS actually mailed the letters. They were not produced in time to be admitted at the Hearing. Defendant objects on the grounds that (1) the certificates were not produced, and were not required to be produced, in response to the subpoena issued by the Hearing Officer in the instant case, and (2) the certificates would serve no purpose because all the relevant parties have already testified about the mailing of the 2005 letters.

The Court will allow the admission of the mailing certificates.  The Parent did not have access to the certificates until after the Hearing.  And the certificates are relevant to the Hearing Officer's finding that the FCPS mailed the 2005 letters, taking "relevant" in its broadest possible sense.  The Court sees no harm in admitting them.  It finds the argument that their existence somehow shows that the 2005 letters were never mailed to the Parent wholly unconvincing.  *See supra* note 4.

2. <u>Testimony of Plaintiffs' Lawyers in Response to</u>
   <u>Arguments Defendant May Make Regarding Attorneys'</u>
   <u>Fees</u>

Plaintiffs ask the Court to allow them to submit evidence responsive to arguments that Defendant makes about the reasonableness of their claimed attorneys' fees. Defendant objects to this open-ended request because the reasonableness of a request for attorneys' fees is largely decided as a matter of law.

The Court will not pre-emptively foreclose Plaintiffs' ability to offer evidence that is properly responsive to factual arguments made by Defendant about the reasonableness of the claimed fees. Defendant, for example, may contend that certain items billed for were unnecessary. It would be improper to pre-emptively determine that Plaintiffs may make no response to such an argument. Additionally, evidence about the reasonableness of attorneys' fees does not relate directly to the merits of the action; it was not necessary to include such evidence in the administrative record. The Court will grant Plaintiffs' request to submit additional evidence responsive to Defendants' factual assertions about the reasonableness of Plaintiffs' requested fees.

E. <u>Motion to Strike</u>

On March 27, 2009, Defendant moved to strike the second declaration of Bruce Fein ("Fein"), Plaintiffs' counsel for part of this litigation.  The declaration, which Fein made in support of Plaintiffs' request for attorneys' fees, was attached as Exhibit E to Plaintiffs' reply memorandum.  Defendant asserts that the Court should strike it because it was submitted outside of the agreed discovery schedule and because it includes argumentative opinion testimony.  (Def.'s Mot. to Strike 1-3.)

The Court will deny Defendant's motion but grant Defendant leave to submit additional evidence responsive to any new allegations in Fein's second declaration when Defendant opposes Plaintiffs' attorneys' fee request.  First, the Court does not believe that the submission of evidence regarding the reasonableness of the attorneys' fees is strictly governed by 20 U.S.C. § 1415(i)(2)(C)(ii), which allows a party to submit "additional evidence" going to the merits of an administrative appeal.  *See Richardson Indep. Sch. Dist. v. Michael Z.*, 561 F. Supp. 2d 589, 609 (N.D. Tex. 2007).  Second, Fein no longer represents Plaintiffs, and so he would not be able to respond to allegations about his performance or the hours he spent working on each issue in the same manner that Plaintiffs' current counsel would if its work were called into question.

48

Defendant is correct that Plaintiffs' late submission did not give them time to respond to Fein's arguments.  Because the Court will consider the question of attorneys' fees after deciding the merits, Defendant will be able to respond to the Fein declaration in their opposition to Plaintiffs' motion.  The Court will also grant leave to submit any additional documentary evidence that bears on issues raised in the declaration at the time they oppose Plaintiffs' attorneys' fee petition.

### VI. Conclusion

For the reasons stated above, the Court will grant in part and deny in part Plaintiffs' Motion for Summary Judgment and deny Defendant's Motion for Summary Judgment.  Additionally, the Court will deny Defendant's motion to strike.  It will grant Plaintiffs' motion to admit additional evidence.  The new evidence offered by Plaintiffs will be allowed into the record with the limitations noted above.

An appropriate Order will issue.


August 3, 2009
Alexandria, Virginia

                                        /s/
                          _____
                                James C. Cacheris
                     UNITED STATES DISTRICT COURT JUDGE